Benedict P. Morelli (BM-6597)
David S. Ratner (DR-7758)
Rory I. Lancman (RL-9404)
MORELLI RATNER PC
*Attorneys for Plaintiff Mustafa Abuelhija*
950 Third Avenue
New York, New York 10022
(212) 751-9800
(212) 751-0046 (fx.)
rlancman@morellilaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mustafa Abuelhija, | 05 Civ. 10393 (JGK) (DFE) |
| Plaintiff, | |
| v. | ECF CASE |
| David Chappelle, Pilot Boy Productions, Inc., Bob Yari Productions, and Block Party Productions, LLC, | **FIRST AMENDED COMPLAINT** |
| | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Mustafa Abuelhija, by his attorneys Morelli Ratner PC, complains against

defendants David Chappelle, Pilot Boy Productions, Inc., Bob Yari Productions, and Block Party

Productions, LLC, as follows:

### Preliminary Statement

1. Plaintiff invokes this Court's diversity jurisdiction seeking monetary damages and

declaratory and injunctive relief in his effort to enforce the terms of two oral contracts concerning

plaintiff's position as personal manager to defendants David Chappelle and Pilot Boy

Productions, Inc. ("Pilot Boy Productions"), the corporate vehicle through which David

Chappelle conducted his business as a comedian and actor (defendants David Chappelle and

Pilot Boy Productions are hereinafter sometimes referred to together as "Chappelle"), and

plaintiff's right to a producer credit in the film *Dave Chappelle's Block Party*.

2.  The first contract is the personal management contract which existed between plaintiff and Chappelle, whereby as consideration for plaintiff's performance as David Chappelle's personal manager plaintiff was to receive 5% of Chappelle's revenue derived from David Chappelle's personal appearances during plaintiff's tenure as his personal manager, and 10% of all revenue received by Chappelle arising from any entertainment deals executed during plaintiff's tenure as David Chappelle's personal manager.  Chappelle has earned millions of dollars in both personal appearances and entertainment deals, but has not made any distribution to plaintiff as required under their contract.

3.  The second contract is the contract which existed between plaintiff and defendants whereby as consideration for plaintiff performing the responsibilities and functions of a producer on the film *Dave Chappelle's Block Party*, plaintiff would be awarded an on-screen producer credit.

4.  The film *Dave Chappelle's Block Party* is being finalized right now under a deadline of December 31, 2005, requiring immediate action by this Court to protect plaintiff's right to a producer credit.

## **Jurisdiction and Venue**

5.  This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity). Plaintiff is a citizen of New York, defendant David Chappelle is a citizen of Ohio, defendant Pilot Boy Productions, Inc. is a citizen of Delaware and Maryland, defendant Bob Yari Productions is a citizen California, defendant Block Party Productions, LLC is a citizen of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).

## Parties

7. Plaintiff Mustafa Abuelhija is defendant David Chappelle's former personal manager and a citizen of New York.

8. Defendant David Chappelle is a comedian and actor, and a citizen of Ohio.

9. Defendant Pilot Boy Productions, Inc. is a Delaware corporation with its principal place of business in Maryland.

10. Defendant Bob Yari Productions is a California corporation with its principal place of business in California.

11. Defendant Block Party Productions, LLC is a California limited liability company with its principal place of business in California.

## Facts

### A. Background

12. David Chappelle is a world renown comedian and actor, performing stand-up in venues across the United States and appearing in roles in movies and on television. Until approximately June of 2005, Chappelle was the star of a highly successful television show on the Comedy Central television network, *Chappelle's Show*.

13. Plaintiff met David Chappelle in or about 2000, while plaintiff managed a well-known comedy club in New York City where David Chappelle regularly performed.

14. Chappelle hired plaintiff in or about the first half of 2001 to assist Chappelle during the filming of the movie *Undercover Brother* in Toronto, Canada. Plaintiff quit his job managing the comedy club and was paid a $2,000 monthly salary through Pilot Boy Productions.

15. Plaintiff continued to serve Chappelle as a jack-of-all-trades, assisting David Chappelle in every aspect of his career, including traveling extensively with David Chappelle and

regularly interacting on Chappelle's behalf with Chappelle's professional team, attorneys, agents and business partners. All the while plaintiff was paid a monthly salary through Pilot Boy Productions, which was raised to approximately $3,000 per month in or about December 2001 and approximately $6,000 per month in or about 2003.

16.  In or about February 2003, David Chappelle commenced a nationwide, thirty city, comedy stand-up tour titled *Dave Chappelle Is Blackzilla*. Plaintiff was the tour manager, advising Chappelle on every aspect of the tour, handling the tour's logistics for Chappelle and accompanying David Chappelle on all of the performances. Plaintiff was paid approximately $2,500 to $3,000 per week while he served as tour manager.

### B. The Personal Management Contract: Negotiation And Agreement

17.  For some time prior to September 2004, plaintiff's responsibilities grew to encompass those which would normally be performed by a personal manager, a position that Chappelle had not filled.

18.  Finally, in or about the Summer of 2004, Chappelle asked plaintiff to serve as his personal manager.

19.  Specifically, on or about July 19, 2004, while in Los Angeles, California, Chappelle offered to pay plaintiff a commission on Chappelle's revenues if plaintiff agreed to serve as Chappelle's personal manager.

20.  A few days later on or about July 22, 2004, while still in Los Angeles, Chappelle and plaintiff negotiated further over the details of their agreement, including the precise percentages to be paid plaintiff for Chappelle's personal appearances and "entertainment deals" (i.e., movies, television shows and DVD deals).

21.  On or about August 30, 2004, while in Los Angeles, Chappelle offered plaintiff the

following terms: plaintiff would assume the title and responsibilities of Chappelle's personal manager effective September 1, 2004, in consideration of which Chappelle would pay plaintiff 5% of Chappelle's revenue derived from David Chappelle's personal appearances during plaintiff's tenure as David Chappelle's personal manager, and 10% of all revenue received by Chappelle arising from any entertainment deals executed during plaintiff's tenure as David Chappelle's personal manager, including continuing royalty payments paid to Chappelle arising from such entertainment deals. Additionally, plaintiff would receive a monthly advance of $10,000 against his commissions.

22. On or about August 31, 2004, while still in Los Angeles, Chappelle further offered to continue to pay the salary of Chappelle's assistant, Tracy Sullivan, whose primary responsibility would remain handling David Chappelle's personal, non-business related correspondence, but who would also be assigned to assist plaintiff.

23. On or about September 1, 2004, while still in Los Angeles, plaintiff accepted Chappelle's offer. Chappelle informed the other professionals working for him that plaintiff had assumed the title and responsibilities of Chappelle's personal manager.

24. The terms of plaintiff's and Chappelle's agreement ("the Personal Management Contract") were negotiated and agreed upon entirely in California and reflected the standards and practices in the entertainment industry concerning the compensation of personal managers, including plaintiff's right to his commission on continuing royalties received by Chappelle arising from the entertainment deals executed during plaintiff's tenure as Chappelle's personal manager.

25. This agreement was never reduced to writing. However, Chappelle informed numerous individuals, including Chappelle's own retained professionals as well as others in the

entertainment industry with whom Chappelle did business, that plaintiff was his personal manager. Chappelle also discussed the specific terms of the Personal Management Contract with others. Indeed, Chappelle's business and financial records evidence the terms of the Personal Management Contract.

## C. The Personal Management Contract: Performance

26. As reflected in the compensation structure of plaintiff's Personal Management Contract, plaintiff's primary function as Chappelle's personal manager was to negotiate and assist Chappelle's other retained professionals in negotiating entertainment deals for Chappelle.

27. Given the nature of the entertainment industry, the majority of these negotiations occurred either physically in California or over the phone and by email with individuals and entities in California.

28. For example, during a trip to Los Angeles over October 7-8, 2004, plaintiff engaged in six different meetings concerning contemplated or proposed entertainment deals, including, for example:

a. Plaintiff met with the president of the Comedy Central network, Doug Herzog, to negotiate the critical aspects of the new *Chappelle's Show* deal for the upcoming third season, which negotiations had been stalled;

b. Plaintiff met with Tom Shadyac, the director of such hit movies as *The Nutty Professor*, *Ace Ventura*, and *Bruce Almighty*, to negotiate a movie in which David Chappelle would star, tentatively titled *The History of Black People By Dave Chappelle*, which was being developed by New Line Cinema and Universal Pictures. David Chappelle verbally agreed to star in this movie, but the project was derailed when he disappeared from the set of *Chappelle's Show* in April 2005, as described below;

c.   Plaintiff met with executives of Fox DVD sales and Sony DVD sales, who were competing for the rights to sell a DVD of Chappelle's stand-up comedy performance, *Dave Chappelle: For What It's Worth*, and negotiated an extraordinary deal securing Chappelle a $1.4 million advance and royalties of 90%.

29.   In fact, most of plaintiff's negotiations on Chappelle's behalf were conducted either while he was physically in California, or over the phone with deal makers who were in California.

**D. Dave Chappelle's Block Party**

30.   In or about August 2004, while Chappelle and plaintiff were negotiating the terms of plaintiff's Personal Management Contract, Chappelle asked plaintiff to take on producer responsibilities with respect to a movie deal which was being planned for Fall 2004, titled *Dave Chappelle's Block Party*, which went far beyond the responsibilities and duties of a personal manager and in fact were those of a producer, in exchange for plaintiff receiving a producer credit in the movie.

31.   Defendant Bob Yari Productions was Chappelle's co-investor in the film *Dave Chappelle's Block Party*, and defendant Block Party Productions, LLC was formed to serve as the film's owner.

32.   Upon information and belief, defendants Chappelle and Bob Yari Productions are the sole owners of defendant Block Party Productions, LLC.

33.   *Dave Chappelle's Block Party* is a combination of David Chappelle's life story and a one-day, hip-hop music concert filmed on a Brooklyn street in September 2004 by the acclaimed director Michel Gondry.  The movie was made on a shoe-string budget on the fly.  The location of the concert was kept secret until the last moment, as were the identities of the artists

performing, many of whom did not actually to commit to the project until mere days before shooting. In fact, the actual terms of the deal underlying the movie were not finalized until after the movie was shot, and included Chappelle investing 33% of the cost (approximately $1.1 million) but being entitled to 60% of the profit.

34. Chappelle was deeply concerned that the movie proceed exactly as Chappelle envisioned, with as little interference and input from his investing partner and others as possible. Chappelle asked plaintiff to immerse himself in every detail of the movie and its production in order to maintain Chappelle's control over the movie.

35. Plaintiff agreed to assume and perform, and did assume and perform, the responsibilities and functions of a producer for *Dave Chappelle's Block Party*.

36. Necessarily, defendants Bob Yari Productions and Block Party Productions, LLC consented to, accepted, agreed to, acknowledged and benefitted from plaintiff's service as a producer in exchange for plaintiff receiving a producer credit in the film. Indeed, employees and agents of defendants Bob Yari Productions and Block Party Productions, LLC interacted constantly with plaintiff during the production of the film while plaintiff executed his responsibilities as a producer on the film.

37. As voluminous email records confirm, plaintiff oversaw the entire production of *Dave Chappelle's Block Party*, including the selection of talent, the selection of songs to be performed, negotiations with the film's investors, design and construction of the set, and ensuring adequate security arrangements. Virtually every element of the production went through plaintiff.

38. In fact, there are memoranda from the film's operations which expressly identify plaintiff as the "Creative Producer."

39.  Defendants sold *Dave Chappelle's Block Party* to Focus Features, LLC.

40.  Defendants are finalizing production of the *Dave Chappelle's Block Party* with a deadline of December 31, 2005, by which time the film must be delivered to Focus Features, LLC.

41.  Upon information and belief, Focus Features, LLC plans to release *Dave Chappelle's Block Party* in movie theaters in March 2006.

42.  Once *Dave Chappelle's Block Party* is finalized by December 31, 2005, it will be impossible to award plaintiff an on-screen producer credit.

### E. David Chappelle Disappears From The Set Of Comedy Central

43.  In or about January 2005, after months of intense negotiation, Chappelle signed an agreement with Comedy Central for the third and fourth seasons of *Chappelle's Show* ("the Season Three Contract").

44.  By any measurement, the contract obtained for Chappelle was extraordinary.  The highlights include a $4.5 million nonrefundable up-front payment, 50% royalties on DVD and merchandising sales retroactive to sales of season one DVDs (thereby renegotiating the paltry royalty percentage in Chappelle's previous contract), $275,000 per episode, and approximately $25,000 per re-run.

45.  Despite Chappelle's contractual obligation under the Season Three Contract and the enormous sum of money at stake (not only to Chappelle but to those, like plaintiff, who worked so hard for so long on a commission basis to obtain this contract for Chappelle), Chappelle essentially walked away from his contractual obligation having completed only approximately half of the third season episodes of *Chappelle's Show.*  On or about April 28, 2005, with Comedy Central spending millions of dollars advertising the May 31st debut of the third season of

*Chappelle's Show*, Chappelle disappeared to South Africa for an undefined "spiritual retreat", only to reemerge a few weeks later to perform stand-up routines in the United States.

46.   Upon information and belief, Comedy Central will air these season three episodes during the second quarter of 2006, presumably paying Chappelle for these episodes pursuant to the Season Three Contract.

**F. The Personal Management Contract: Termination**

47.   On or about June 23, 2005, Chappelle fired plaintiff at a hotel in San Francisco, California.

48.   In July 2005, plaintiff was given a paltry $40,000 as an "advance" against the sum which plaintiff claimed was owed him in commissions under the Personal Management Contract.

**G. The Commissionable Revenue Owed Plaintiff**

49.   Between September 1, 2004 and June 23, 2005, Chappelle received approximately $2,261,000 from personal appearances, and plaintiff is entitled to 5% of this revenue, or $113,000.

50.   Between September 1, 2004 and June 23, 2005, Chappelle executed the following three entertainment deals, resulting in the following commissions owed to plaintiff:

a.   *Dave Chappelle's Block Party* – Chappelle is entitled to 60% of the profits of this movie, and plaintiff is entitled to 10% of those profits after Chappelle recoups his initial $1.1 million investment;

b.   *Chappelle's Show* –

i.   Chappelle received $4.5 million in or about January 2005, plus approximately $650,000 for partial performance in the Spring of 2005, plus approximately $965,000 in royalties from DVD sales in the Spring of 2005, for a total of $6,115,000. Plaintiff is

entitled to 10% of this revenue, or $611,500;

          ii.  Upon information and belief, Chappelle continues to receive, and will continue to receive, royalties and payments pursuant to the Season Three Contract for DVD and other merchandising sales and for the airing of the completed season three episodes.  Plaintiff is entitled to 10% of those revenues;

        c.  *Dave Chappelle: For What It's Worth* –

          i.  Chappelle received $1.4 million in or about March 2005, and plaintiff is entitled to 10% of that revenue, or $140,000;

          ii.  Upon information and belief, Chappelle continues to receive, and will continue to receive, royalties for sales of the *Dave Chappelle: For What It's Worth* DVD, and plaintiff is entitled to 10% of those revenues.

## FIRST CAUSE OF ACTION
### (Breach of Contract: Plaintiff's Currently Ascertainable Commissions)

51.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.  Defendants Chappelle and Pilot Boy Productions have breached the Personal Management Contract because they have not paid plaintiff any of the commissions that he is owed.

53.  As a consequence of defendants Chappelle's and Pilot Boy Productions' breach of the Personal Management Contract, plaintiff has been damaged as follows:

        a.  $113,000 in commissions owed from Chappelle's personal appearances;

        b.  $611,500 in commissions owed from payments made to Chappelle pursuant to the Season Three Contract for *Chappelle's Show*;

c. $140,000 in commissions owed from payments made to Chappelle pursuant to the contract for *Dave Chappelle: For What It's Worth*;

d. An amount currently unknown to plaintiff but presently ascertainable representing commissions earned from payments made to Chappelle after plaintiff's termination for DVD and merchandising sales of *Chappelle's Show* pursuant to the Season Three Contract;

e. An amount currently unknown to plaintiff but presently ascertainable representing commissions earned from payments made to Chappelle after plaintiff's termination for DVD sales of *Dave Chappelle: For What It's Worth*.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment: Plaintiff's Continuing Commissions)

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. Defendants Chappelle and Pilot Boy Productions have breached the Personal Management Contract with respect to plaintiff's current and ascertainable commissions because they have not paid plaintiff any of the commissions that he is owed.

56. Defendants Chappelle and Pilot Boy Productions have no intention of paying plaintiff the continuing commissions which he will be owed for the following future revenue streams which will flow to Chappelle as a result of entertainment deals executed during plaintiff's tenure as Chappelle's personal manager:

a. Chappelle's profits from the film *Dave Chappelle's Block Party*, for which plaintiff is entitled to a 10% commission after Chappelle recoups his $1.1 million investment;

b. Royalties and other payments pursuant to the *Chappelle's Show* Season Three Contract, including royalties for DVD and merchandising sales, re-runs and the eventual airing of

the completed season three episodes;

      c.  Royalties for sales of the *Dave Chappelle: For What It's Worth* DVD.

57.  As a consequence of defendants Chappelle's and Pilot Boy Productions' refusal to recognize and acknowledge plaintiff's right to these continuing commissions, plaintiff will be damaged unless this Court issues a judgment declaring plaintiff's right to these continuing commissions.

### THIRD CAUSE OF ACTION
### (Breach of Contract & Injunctive Relief:
### On-Screen Producer Credit For *Dave Chappelle's Block Party*)

58.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.  Defendants contracted with plaintiff to provide plaintiff with an on-screen producer credit in the film.

60.  Production of the *Dave Chappelle's Block Party* film is being finalized with a completion deadline of December 31, 2005.

61.  Once *Dave Chappelle's Block Party* is finalized by December 31, 2005, it will be impossible to award plaintiff an on-screen producer credit.

62.  Defendants refuse to provide plaintiff with the on-screen producer credit which he was promised, despite plaintiff having performed his contractual obligation to serve as a producer on the film.

63.  Plaintiff will be irreparably harmed if defendants finalize *Dave Chappelle's Block Party* prior to this Court's determination whether plaintiff is indeed entitled to a producer credit.

64.  The Court must enjoin defendants from finalizing production of *Dave Chappelle's Block Party*, and order defendants to award plaintiff an on-screen producer credit.

## Conclusion

65. **Wherefore,** plaintiff demands judgment against defendants as follows:

    a. Monetary damages against defendants Chappelle and Pilot Boy as follows:

        i. $113,000 in commissions owed from Chappelle's personal appearances;

        ii. $611,500 in commissions owed from payments made to Chappelle pursuant to the Season Three Contract for *Chappelle's Show*;

        iii. $140,000 in commissions owed from payments made to Chappelle pursuant to the *Dave Chappelle: For What It's Worth* contract;

        iv. An amount currently unknown to plaintiff but presently ascertainable representing commissions earned from payments made to Chappelle after plaintiff's termination for DVD and merchandising sales of *Chappelle's Show* pursuant to the Season Three Contract;

        v. An amount currently unknown to plaintiff but presently ascertainable representing commissions earned from payments made to Chappelle after plaintiff's termination for DVD sales of *Dave Chappelle: For What It's Worth*.

    b. Declaratory relief against defendants Chappelle and Pilot Boy, declaring plaintiff's rights as follows:

        i. The right to a 10% commission on Chappelle's profits from the film *Dave Chappelle's Block Party*, after Chappelle recoups his $1.1 million investment;

        ii. The right to a 10% commission on royalties and other payments pursuant to the *Chappelle's Show* Season Three Contract, including royalties for DVD and merchandising sales, re-runs and the eventual airing of the completed season three episodes;

        iii. The right to a 10% commission on royalties for DVD sales of *Dave*

*Chappelle: For What It's Worth.*

        c.  Injunctive relief against each of the defendants, ordering them to include

plaintiff in the on-screen credits of *Dave Chappelle's Block Party* as a producer.

        d.  Such other and further relief as this court deems just, including costs and

attorneys' fees.

**Jury Trial Demand**

    66.  Plaintiff demands a trial by jury.

Dated: December 15, 2005
       New York, New York

                        Benedict P. Morelli (BM-6597)
                        David S. Ratner (DR-7758)
                        Rory I. Lancman (RL-9404)
                        MORELLI RATNER PC
                        *Attorneys for Plaintiff Mustafa Abuelhija*
                        950 Third Avenue
                        New York, New York 10022
                        (212) 751-9800
                        (212) 751-0046 (fx.)
                        rlancman@morellilaw.com